United States District Court
Southern District of Texas
**ENTERED**
March 10, 2025
Nathan Ochsner, Clerk

United States District Court
Southern District of Texas
FILED
MAR 10 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| PAUL ALEXANDER SERRANO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:22-CV-347 |
| | § | |
| EDDIE GARZA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### REPORT AND RECOMMENDATION

Plaintiff PAUL ALEXANDER SERRANO, appearing pro se and in forma pauperis, brings this civil action pursuant to 42 U.S.C. § 1983 raising violations of his constitutional rights while he was a pre-trial detainee at the Hidalgo County Adult Detention Center (the "Detention Center"). Plaintiff seeks redress in the form of money damages based on claims of the infringement of his First Amendment right to the free exercise of religion and of retaliation for engaging in protected First Amendment activities. According to Plaintiff, two corrections officers at the Detention Center, Defendants First Lieutenant David Flores ("Lt. Flores") and Lieutenant Oneida Salinas ("Lt. Salinas"), destroyed several of Plaintiff's *Santeria*, or *Yoruba*, religious items, verbally disparaged him, and threatened to put him in solitary confinement because he had previously made written grievances about other corrections officers.

Defendants have filed several dispositive motions, including a *Motion for Sanctions* for the failure to prosecute (Dkt. No. 68), as well as a combined *Motion to Dismiss* for the failure to state a claim and *Motion for Summary Judgment* (Dkt. No. 69). Defendants move for dismissal insofar as Plaintiff has failed to raise genuine issues of material fact over matters like their personal involvement and whether the alleged conduct violated constitutional norms. Upon the Magistrate

Judge's order, Defendants have filed supplemental briefing and evidence in support of summary judgment. (*See* Dkt. Nos. 80, 83). Plaintiff has responded. (*See* Dkt. Nos. 72, 84, 96).

This case was referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the pleadings, the record evidence, the briefs, and the applicable law, the Magistrate Judge RECOMMENDS that Defendants' *Motion for Summary Judgment* (Dkt. No. 69) be GRANTED and that their *Motion for Sanctions* (Dkt. No. 68) and *Motion to Dismiss* (Dkt. No 69) be DENIED as moot. Accordingly, the Magistrate Judge further RECOMMENDS that Plaintiff's claims be DENIED and that this civil action be DISMISSED.

## I. BACKGROUND

When he filed his initial complaint in September 2022, Plaintiff was being held at the Detention Center in pre-trial custody on charges related to deadly conduct for the discharge of a firearm.[1] (Dkt. No. 1). Through those pleadings, Plaintiff raised issues with the nature of his mental health treatment. Soon thereafter, Plaintiff filed an amended complaint, providing further elaboration as to his ostensibly inadequate healthcare. (*See* Dkt. No. 7).

In November 2022, however, the Clerk of Court received Plaintiff's second amended complaint, whereby Plaintiff began to voice concerns as to the denial of his religious freedoms. (*See* Dkt. No. 13). According to Plaintiff, for the preceding ten months that he had been at the Detention Center, unidentified officers had been "tak[ing] apart [his] [religious] altar" and "throw[ing] [his] offerings" of apples. (*Id.* at 2). Because of the disparate nature of Plaintiff's

---

[1] Plaintiff's criminal case records can be accessed by using his name to query the Hidalgo County Records Inquiry page at https://pa.co.hidalgo.tx.us/default.aspx. Upon his conviction in March 2023, Plaintiff would be transferred to the custody of the Texas Department of Criminal Justice—specifically, the McConnell Unit located in Beeville, Texas. (Dkt. No. 41). Since then, Plaintiff has been transferred into the custody of the Pennsylvania Department of Corrections. (Dkt. No. 67). A query of the search page for the Unified Judicial System of Pennsylvania, available at https://ujsportal.pacourts.us/CaseSearch, reflects that Plaintiff is serving a prison sentence on a criminal conviction related to fleeing or attempting to elude a law enforcement officer.

claims, the Magistrate Judge ordered that he submit another amended complaint on a standardized prisoner complaint form. (Dkt. No. 39).

In July 2023, Plaintiff submitted a third amended complaint as ordered. (Dkt. No. 42).

In September 2023, upon review of the third amended complaint, the Magistrate Judge ordered Plaintiff to provide a more definite statement in the form of written responses to questions as to the facts underlying his claims. (Dkt. No. 46).

Plaintiff submitted responses to the questionnaire as ordered. (Dkt. No. 50).

To summarize his pleadings, Plaintiff alleges that Defendants destroyed his religious effects, verbally disparaged him, and threatened to put Plaintiff in solitary confinement because he had previously made written grievances about other corrections officers. These allegations are discussed in greater detail below.

In March 2024, Defendants filed an answer. (Dkt. No. 60).

The Magistrate Judge then issued a scheduling and pre-trial order (Dkt. No. 61), setting deadlines for the completion of discovery and the filing of dispositive motions.

In June 2024, Defendants filed the Motion for Sanctions (Dkt. No. 68), seeking dismissal under Rule 41 of the Federal Rules of Civil Procedure based on Plaintiff's failure to serve them with initial disclosures according to the scheduling order.[2] (*Id.* at 3-5). Filed concurrently were the combined Motion to Dismiss and the Motion for Summary Judgment. (Dkt. No. 69). For purposes of their Motion to Dismiss, Defendants seek dismissal under Rule 12(b)(6) for the failure to state a claim insofar as Plaintiff's failure to allege any physical injury bars the recovery of

---

[2] The merits of this motion need not be addressed to the extent that Plaintiff's claims are disposed of on summary judgment.

compensatory damages under 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act of 1995.[3] (*Id.* at 6-7, 13). In terms of summary judgment, Defendants argue that Plaintiff fails to offer evidence that: (i) they destroyed Plaintiff's religious effects (*id.* at 14-16); (ii) any such destruction was not reasonably related to a legitimate penological interest (*id.* at 15-16, 19-21); (iii) the interrogation of Plaintiff ever occurred (*id.* at 13-15); (iv) any interrogation constituted an adverse retaliatory act (*id.* at 16-19); and (v) any conduct by Defendants caused Plaintiff mental and emotional injuries (*id.* at 12-13). In support, Defendants offered documentary evidence, including Detention Center policy statements, as well as the affidavit of Lt. Flores. (Dkt. Nos. 69-1 through 69-9). The substance of this supporting evidence is addressed below.

In July 2024, Plaintiff responded to the pending motions, challenging the veracity of some of the documentation offered by Defendants. (*See* Dkt. No. 72). At issue was the peripheral matter over the specific unit of the Detention Center in which Plaintiff was housed when the underlying conduct supposedly occurred. (*See id.* at 1-4). Defendants filed a reply. (Dkt. No. 73).

In November 2024, the Magistrate Judge ordered Defendants to provide supplemental briefing with documentation or affidavits detailing the administrative policy and records concerning Plaintiff's religious items and their destruction. (Dkt. No. 80).

In December 2024, Defendants submitted their briefing as ordered (Dkt. No. 83), the substance of which is addressed below. Plaintiff filed his own brief—again challenging the matter over the unit in which he was housed. (*See* Dkt. No. 84).

---

[3] The merits of the Motion to Dismiss need not be addressed to the extent that Plaintiff's claims are disposed of on summary judgment. That said, the Magistrate Judge notes that, even though § 1997e(e) does bar the recovery of compensatory damages without physical injury, the lack of physical injury does not necessarily preclude other forms of relief. *See Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005) (per curiam). For example, a plaintiff may seek nominal or punitive damages for claims of First Amendment infringement under Section 1983. *See Keys v. Torres*, 2015 WL 5456317, at *5 (S.D. Tex. May 11, 2015) (citing *Tuft v. Texas*, 410 F. App'x 770, 770 (5th Cir. 2011) (per curiam)), *report and recommendation adopted*, 2015 WL 5456699 (S.D. Tex. Sept. 15, 2015).

The Magistrate Judge ordered Plaintiff to submit a specific response to Defendants' briefing. (Dkt. Nos. 85, 90, 94). Plaintiff has since filed a response (Dkt. No. 96), the substance of which is addressed below.

## II. FACTUAL ALLEGATIONS

Plaintiff alleges through the live pleadings as follows:

> [On September 9, 2022,] I was pulled out of my unit, which was Foxtrot 4A, by Lt. Flores and Lt. Salinas, when they took me into [the multipurpose] room and started to interrogate, saying, "Are you stupid to think that you can file a grievance against my officers and threaten us with legal actions? You will not get anything." From that day forward, they kept destroying my religious items and altar.

(Dkt. No. 42 at 5 (edited for readability); *see also* Dkt. No. 50 at 1). The religious items, specifically, are: (i) pictures of Yoruba religious figures; (ii) an African-crafted pendant affixed to a gold chain; and (iii) prayers handwritten by Plaintiff's late grandfather. (Dkt. No. 50 at 1-2). In terms of the disposition of the items, Plaintiff alleges that the pictures were "ripped up[,] some thrown away[,]" and that the pendant was "taken" along with the gold chain. (*Id.* at 1). Plaintiff was allegedly told that the items should not have been on his bunk. (*Id.*).

Plaintiff claims that his First Amendment right to the free exercise of religion was violated insofar as the destruction of his religious items hampered his ability to practice and express his religious beliefs. (*Id.* at 2).

Plaintiff also generally claims that Lt. Flores and Lt. Salinas took the acts they did in retaliation for Plaintiff's exercise of his First Amendment right to express grievances against the Detention Center and its officers. (*Id.* at 1-2). The nature of these past grievances is unclear. But through his initial pleadings, Plaintiff does refer to filing at least two grievances over his mental health treatment that pre-dated his alleged interrogation. (*See* Dkt. No. 1 at 2).

## III. LEGAL STANDARDS

### A. <u>Summary Judgment</u>

Summary judgment is appropriate where (i) there is no genuine issue of material fact and (ii) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. *Mathis v. Brazoria Cnty. Sheriff's Off.*, 2011 WL 3648101, at *3 (S.D. Tex. Aug. 17, 2011) (citing *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 260 (5th Cir. 2007)). When the nonmovant would bear the burden of proof at trial, the movant may satisfy their initial burden by pointing to the absence of evidence supporting the nonmovant's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). A fact is "material" if its resolution might affect the disposition of the suit under the governing law. *Id.* (citing *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009)).

### B. <u>Free Exercise of Religion</u>

Although prisoners retain their right to the free exercise of religion, this right becomes "subject to reasonable restrictions and limitations necessitated by penological goals." *DeMarco v. Bynum*, 2020 WL 6130144, at *1 (N.D. Tex. Sept. 29, 2020) (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)), *aff'd*, 50 F.4th 479 (5th Cir. 2022) (per curiam). To establish a First Amendment free exercise violation, a prisoner must demonstrate that officials impeded their engagement in religious conduct without any justification related to legitimate penological concerns.[4] *Id.* at *1 (citing *Turner*, 482 U.S. at 89). In evaluating these claims, courts consider the following factors of the so-called "rational relationship" test: (i) whether a valid, rational connection exists between

---

[4] Some circuits require a threshold showing that the challenged regulation substantially burdens religious exercise. *See, e.g., Ford v. McGinnis*, 352 F.3d 582, 592 (2d Cir. 2003). The Fifth Circuit, however, rejects this approach and reserves the "substantial burden" inquiry for evaluating free exercise claims brought under the Religious Freedom Restoration Act and the Religious Land Use and Institutionalized Persons Act. *Butts v. Martin*, 877 F.3d 571, 585-86 (5th Cir. 2017).

the restriction and the legitimate governmental objective proffered as justification; (ii) the availability of alternative means of exercising the fundamental right; (iii) the impact that accommodating the constitutional right would have on guards, other inmates, and prison resources generally; and (iv) the absence of ready alternatives to the restriction. *Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 89-90) (quotations omitted).

The same standard applies whether the challenge concerns prison authorities' actions or prison regulations. *Butts v. Martin*, 877 F.3d 571, 585-86 (5th Cir. 2017). Indeed, courts "must accord wide deference to prison officials' decisions in light of the need to preserve internal order and security unless there is substantial evidence to indicate that prison administrators have exaggerated their response to such considerations." *DeMarco*, 2020 WL 6130144, at *2 (citing *Turner*, 482 U.S. at 90). The government's objective must ultimately be "a legitimate and neutral one," such that summary judgment will be denied when there is a genuine issue as to the legitimacy of that objective. *Butts*, 877 F.3d at 585 (citing *Mayfield v. Tex. Dep't of Crim. Just.*, 529 F.3d 599, 607, 612 (5th Cir. 2008)).

### C. First Amendment Retaliation

The First Amendment proscribes prison officials from retaliating against inmates for exercising their constitutional right of access to the courts or for lodging complaints to supervisors about a guard's misconduct. *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019) (citing *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995)); *see also Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006) ("A prison official may not retaliate against or harass an inmate for complaining through proper channels about a guard's misconduct."). That said, "[p]risoners' claims of retaliation are regarded with skepticism and are carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (per curiam) (citing *Woods*, 60 F.3d at 1166). In raising a

prima facie case of retaliation, an inmate must allege: (i) their exercise of a specific constitutional right; (ii) the official's retaliatory intent; (iii) a retaliatory adverse act; and (iv) causation. *Gonzalez v. Trevino*, 2021 WL 7184963, at *4 (S.D. Tex. Nov. 12, 2021) (citing *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999) (per curiam)), *report and recommendation adopted in part sub nom. Gonzalez v. Webb Cnty.*, 2022 WL 190709 (S.D. Tex. Jan. 21, 2022).

Absent the prisoner's identification of a specific constitutional deprivation, their claim of retaliation will not survive summary judgment. *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996) (per curiam). "To establish an intent to retaliate, an 'inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.'" *Garner v. Moore*, 536 F. App'x 446, 450 (5th Cir. 2013) (per curiam) (quoting *Woods*, 60 F.3d at 1166). The alleged retaliatory act must be more than de minimis, rising to a level of severity sufficient to deter an ordinary person from further exercising the right that has been violated. *Morris*, 449 F.3d at 686.

As for causation, this requires a showing that the challenged conduct would not have occurred but for the retaliatory motive. *Prescott v. Johnson*, 2022 WL 672694, at *19 (E.D. Tex. Mar. 7, 2022) (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)), *aff'd*, 2023 WL 3723632 (5th Cir. May 30, 2023), *cert. denied*, 144 S. Ct. 561 (2024). "[N]o causal connection can be inferred" from a "two-point chronology" in which a prisoner files a grievance resulting in a corrections officer's demotion, then a different corrections officer searches the prisoner's cell and confiscates their property more than two weeks later. *McClure v. Turner*, 481 F. App'x 167, 172-73 (5th Cir. 2012) (per curiam).

## IV. ANALYSIS

Plaintiff's First Amendment free exercise and retaliation claims will be addressed in turn in the context of summary judgment review.

### A. <u>Free Exercise of Religion</u>

Plaintiff contends that the confiscation or destruction of his religious items—specifically, his pendant and necklace, pictures, and prayers—has impeded his First Amendment right to free exercise of religion. (Dkt. No. 42 at 5; Dkt. No. 50 at 1-2). Defendants respond, in part, that Plaintiff fails to offer evidence sufficient to raise a genuine issue over their personal involvement. (Dkt. No. 69 at 14-16). They otherwise challenge Plaintiff's ability to raise a genuine issue that any disposition of the religious items lacked a legitimate penological purpose. (*Id.* at 15-16, 19-21). The Magistrate Judge concludes that summary judgment for Defendants is warranted.

The Magistrate Judge begins with the matter of Defendants' personal involvement. Through his affidavit, Lt. Flores reviews cell assignment and cellblock logs for the Detention Center dated September 9, 2022—the date on which Defendants supposedly disposed of Plaintiff's religious items and took him to the multipurpose room to interrogate him. (Dkt. No. 69-5 at 2-3; Dkt. Nos. 69-3, 69-4, 69-6). According to this review, Lt. Flores states that Plaintiff was assigned to a cell in a cellblock identified as Foxtrot 2B—not Foxtrot 4A as Plaintiff alleges.[5] (Dkt. No. 69-5 at 3). Whether Foxtrot 4A or Foxtrot 2B, there is no written record of Plaintiff having been removed from his cell on September 9th. (*Id.*). With respect to the destruction of Plaintiff's religious items, Lt. Flores goes on to aver as follows:

> [Plaintiff] alleges that after the incident . . . on September 9, 2022, . . . unidentified persons whom he refers to as "they" kept destroying his religious items and altar. I can state unequivocally that "they" cannot include myself [or] [Lt. Salinas], because we did not engage in any such acts or direct anyone else to engage in such

---

[5] The affidavit is seemingly inconsistent in identifying the cellblock as Foxtrot 2A and Foxtrot 2B (*see* Dkt. No. 69-5 at 3), although a "cell assignment" document refers to Foxtrot 2B (*see* Dkt. No. 69-3).

acts. If his religious items were removed, damaged or destroyed by detention officers, it is possible that this occurred during a shakedown or a visual inspection. Shakedowns occur randomly, or as a result of information, and are when a team of detention officers go into a cell to search for contraband and other illegal items.

(*Id.*).

The Magistrate Judge agrees with Defendants that Plaintiff's pleadings are vague—at best—in alleging that "they" destroyed the religious items. Defendants have placed identity squarely at issue by denying their personal involvement. That said, nowhere through his responses does Plaintiff offer evidence that Defendants themselves are somehow to blame. For example, Plaintiff does not aver that Defendants destroyed or took the items in his presence, say, contemporaneous to when they supposedly removed him from his cell for interrogation. Nor does he aver that another detainee witnessed the act. Instead, Plaintiff devotes his responses to arguing over matters like the accuracy of the cell assignment and cellblock logs—arguments which do not go to the heart of Defendants' denial. (*See, e.g.*, Dkt. Nos. 73, 84). Mere allegations of officials' personal involvement are insufficient to support such personal involvement. *See Gorrell v. Yost*, 509 F. App'x 114, 118 (3d Cir. 2013) (per curiam) (determining that allegation that mailroom officers were "responsible for the daily operations of the mail room" was "insufficient to establish personal liability" with respect to plaintiff's claim that prison mailroom staff "interfered with his legal mail by either deliberately withholding it or opening it and failing to forward it to him").

Moreover, Defendants' personal involvement is not supported by factors like the nature of the interrogation and its relative timing. By Plaintiff's own account, the interrogation did not implicate his religious practices but, rather, his filing of grievances against other officers. More importantly, through his earlier pleadings, Plaintiff alleges that the destruction of his altars began months before the alleged interrogation of September 9, 2022. (*See* Dkt. No. 13 at 2). Plaintiff otherwise fails to clarify when his religious items were next taken and destroyed. The only

documented incident in the record involving Plaintiff's religious items comes by way of a Detention Center grievance dated February 23, 2023, whereby Plaintiff accuses officers of overturning a bowl of water on his pictures and prayers. (Dkt. No. 69-9). This would have occurred over five months after the alleged interrogation, which is too long to support a causal connection to Defendants. *See Ajao v. Bed Bath & Beyond, Inc.*, 265 F. App'x 258, 265 (5th Cir. 2008) (per curiam) (concluding that "temporal proximity of four months is not close enough, without additional supporting summary-judgment evidence, to establish a causal connection between the employment action and the protected conduct"); *see also Ramirez v. PHI Health, LLC*, --- F. Supp. 3d ---, 2025 WL 83377, at *6 (S.D. Tex. Jan. 13, 2025) (citing *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001)) (recognizing that temporal proximity of five months, absent other evidence, does not support a causal connection).

In any event, Defendants argue that Plaintiff cannot demonstrate that the disposition of his religious items was not reasonably related to a legitimate penological interest. According to Defendants, the Detention Center had legitimate interests in maintaining security, safety, and sanitation standards insofar as the religious items constituted unauthorized items, or contraband, subject to disposal upon discovery. (Dkt. No. 69 at 15-16, 19-21; Dkt. No. 83 at 5-6). In support, Defendants offer, again, the affidavit of Lt. Flores (Dkt. Nos. 69-5, 83-3), who conducts a review of the Detention Center's relevant policies found in written sources like the Departmental Policy and Procedure plan (the "DPP") (Dkt Nos. 83-1, 83-6, 83-7, 83-8, 83-9), the 2021 Hidalgo County Sheriff's Office Inmate Handbook (the "Inmate Handbook") (Dkt. Nos. 69-8, 83-2), and a Religious Practices Plan (the "RPP") (Dkt. No. 83-4).

In terms of contraband, the Inmate Handbook states that detainees are "prohibited from having any item that is not received through authorized channels of the Detention Center while

[they] are in jail." (Dkt. No. 69-8 at 4). According to the DPP and the Inmate Handbook, authorized items are generally limited to items issued by the Detention Center (such as certain items of clothing and toiletry items), items purchased at its commissary (such as foodstuffs), and materials acquired from its library. (Dkt. No. 83-1 at 5; Dkt. No. 83-2 at 2; Dkt. No. 83-3 at 1-2; Dkt. No. 83-6 at 1-2; Dkt. No. 83-8 at 9; Dkt. No. 83-9 at 1). Based on the RPP, however, religious items that would otherwise be designated as contraband may be obtained through a specified religious accommodation request procedure. (Dkt. No. 83-4 at 2-3). Any items obtained through other means, altered from their original state, or used in a manner other than intended constitute contraband. (Dkt. No. 83-3 at 2; Dkt. No. 83-9 at 1). Officers may conduct unannounced searches "to detect and prevent the introduction of contraband" and to "maintain sanitary standards, and eliminate fire and safety hazards." (Dkt. No. 83-7 at 1-2, 5; *see also* Dkt. No. 83-9 at 1). Upon discovery, any contraband is subject to confiscation and destruction by a detention officer unless the item warrants return to the detainee or alternative disposition. (Dkt. No. 83-9 at 3).

> With specific respect to Plaintiff's jewelry items, Lt. Flores avers as follows:
>
> [Plaintiff] alleges that an 18 [karat] gold necklace and pendant was one of the religious items which were taken from his cell. I consider it to be highly unlikely that [he] could have had such an item in his cell. For safety and security reasons, inmates are not allowed jewelry in the [Detention Center]. All jewelry is taken from detainees during the booking policy process and placed in a property locker.

(Dkt. No. 69-5 at 3). According to Lt. Flores, "[a] necklace can be used as a garrote or could be stolen by another inmate and precipitate an assault or other violent act." (Dkt. No. 83-3 at 2). As for the disposition of Plaintiff's pictures and papers, Lt. Flores points to the Inmate Handbook, which states that detainees "are required to keep [their] cell clean and free of trash, food and debris[,]" and that "[a]t no time will pictures or paper be put on any cell wall or windows." (Dkt. No. 69-5 at 4; Dkt. No. 69-8-at 1). In terms of safety and health concerns, Lt. Flores states that

unauthorized paper items, like "[the] pages of book[s] . . . [,] can be soaked in drug infused solutions." (Dkt. No. 83-3 at 2). He further states that "[i]tems are not to be placed on a wall, because they will block a detention officer's ability to inspect the wall to check, for example, the cement between the cinderblocks is intact and has not been dug out." (*Id.*). Items placed on a wall or on a bunk may raise further security concerns insofar as they would obstruct the view of detention officers. (Dkt. No. 69-5 at 3).

Through his affidavit, Lt. Flores reviews Plaintiff's Inmate Intake Property Inventory Sheet, which does not list any jewelry items, pictures, or papers. (Dkt. No. 83-3 at 2; Dkt. No. 83-5 at 2). Lt. Flores's statement as to the securing of jewelry at booking is consistent with the DPP. (Dkt. No. 83-6 at 1-2). The DPP otherwise provides that money and other valuables are subject to disposal as contraband. (Dkt. No. 83-9 at 3).

Lt. Flores goes on to review the RPP and the Detention Center's religious accommodation policies and practices. (Dkt. No. 83-3 at 2). According to Lt. Flores, "[i]t is a Detention Center practice to accommodate religious requests[,]" which "could include the possession of an altar, as long as it is not placed on a wall, or placed so that it blocks [an officer's] view of a cell, or blocks . . . access to all parts of a cell during an inspection[.]" (*Id.*). Pursuant to the RPP, accommodation requests are to be made via request forms, which are forwarded to a Rehabilitation Officer for review. (Dkt. No. 83-4 at 2). If a request is denied, the reason will be noted on the request form, and the detainee may then utilize the Detention Center's grievance procedures to contest the denial. (*Id.*). That said, upon searching Plaintiff's detainee file and the Detention Center's grievance records, Lt. Flores claims not to have found any "record of any request by Plaintiff for religious accommodation or for permission to possess any religious items" or any "record of any grievance related to any denial of any such request." (Dkt. No. 83-3 at 2). The only document from

Plaintiff's file concerning his religious items, Lt. Flores avers, is the grievance dated February 23, 2023. (*Id.* at 3; Dkt. No. 69-9).

Through his response, Plaintiff addresses his gold pendant and his pictures and papers. (Dkt. No. 96). According to Plaintiff, he "was allowed to keep [the pendant] on [his] person" on intake and was "never asked . . . to remove it" presumably because it "was smaller than a fifty cent piece" and "had no stones[.]" (*Id.* at 5). He also states that the pendant and other items "were all on [his] altar at the head of [his] bunk[,]" and that "nothing was affixed to the walls." (*Id.* at 3).

Other than that, Plaintiff does not challenge the classification and disposal of his religious items as contraband. He does not challenge Defendants' contention that the religious items posed safety concerns. Nor does Plaintiff allege, let alone provide evidence, that he requested a religious accommodation through the proper channels. Accordingly, the instant review turns to whether the disposition of the religious items was reasonably related to legitimate penological interests.

Again, courts are to consider the following factors: (i) whether a valid, rational connection exists between the restriction and the legitimate governmental objective proffered as justification; (ii) the availability of alternative means of exercising the fundamental right; (iii) the impact that accommodating the constitutional right would have on guards, other inmates, and prison resources generally; and (iv) the absence of ready alternatives to the restriction. *Adkins*, 393 F.3d at 564.

To begin, Defendants contend that confiscation and disposition of the religious items served to protect the safety and security of jail staff and inmates. (Dkt. No. 83 at 5-6 (citing Dkt. No. 83-3 at 2)). According to Lt. Flores, necklaces have the potential to be used as weapons, and things of value—like gold jewelry—could precipitate thefts and assaults. (Dkt. No. 83-3 at 2). Also, paper items from outside the Detention Center could potentially be infused with narcotics. (*Id.*). Indeed, the Detention Center's policies over contraband, and the acts of confiscating the

unauthorized religious items at issue, bear a "valid, rational connection" to the legitimate penological interests of prison safety. *See DeMarco v. Bynum*, 50 F.4th 479, 483 (5th Cir. 2022). All indications are that the challenged policies were carried out "in a neutral fashion, without regard to the content of the expression." *See Turner*, 482 U.S. at 90 (citing *Pell v. Procunier*, 417 U.S. 817, 828 (1974)). Defendants' arguments also support the notion that possession of the religious items, without proper administrative requests, would be "at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike." *See id.* at 92; *see also DeMarco*, 50 F.4th at 483. While the denial of a religious accommodation request under the RPP would warrant further analysis, Plaintiff's failure to pursue this channel precludes a finding that alternative means of free exercise of his religion were unavailable to him. Nor does Plaintiff propose any alternatives that would fully accommodate his rights at de minimis cost to valid penological interests. *See DeMarco*, 50 F.4th at 483.

For these reasons, the Magistrate Judge concludes as a matter of summary judgment that Plaintiff has failed to demonstrate, whether against Defendants or anyone else, a violation of his First Amendment rights for the confiscation and disposition of his religious items.

## B. **First Amendment Retaliation**

Plaintiff also contends that, in retaliation for his filing of grievances in which he expressed intent to file suit, Defendants destroyed his religious items and subjected him to an interrogation, during which they verbally disparaged him and threatened him with solitary confinement. (Dkt. No. 42 at 5; Dkt. No. 50 at 1-2). Defendants argue that any such conduct would not amount to an adverse retaliatory conduct (Dkt. No. 69 at 16-19) or have caused Plaintiff's mental and emotional injuries, which had been documented during the booking procedure (*id.* at 12-13 (citing Dkt. Nos. 69-1, 69-2). The Magistrate Judge concludes that summary judgment for Defendants is warranted.

Plaintiff is unable to show that, but for the retaliatory motive, his religious items would not have been destroyed. *See Prescott*, 2022 WL 672694, at *19. From Plaintiff's earlier pleadings, it seems that the destruction of his altars began near-contemporaneous to when he arrived at the Detention Center, and presumably before he began filing grievances—whatever the nature of those grievances may be. (*See* Dkt. No. 13 at 2). Moreover, as thoroughly discussed, the disposition of his religious items adhered to the Detention Center's written policies against contraband.

Plaintiff also fails to raise a genuine issue that any adverse retaliatory acts were sufficiently severe. An adverse act must surpass the de minimis threshold, reaching a level of severity sufficient to deter a person of ordinary firmness from exercising their constitutional rights. *See Morris*, 449 F.3d at 686. As for the interrogation, mere threats of institutional punishment—such as threats of disciplinary cases or solitary confinement—are insufficient to support a constitutional violation. *Decker v. McDonald*, 2010 WL 1424322, at *17 (E.D. Tex. Jan. 11, 2010) (collecting cases), *report and recommendation adopted*, 2010 WL 1424292 (E.D. Tex. Apr. 7, 2010). The record also reflects that Defendants' alleged conduct did not in fact have a chilling effect on Plaintiff's protected activities. *See Ibenyenwa v. Wells*, 2022 WL 413941, at *1 (5th Cir. Feb. 10, 2022) (per curiam), *cert. denied*, 143 S. Ct. 236, (2022) (prisoner's continued filing of grievances belied his assertion of First Amendment chill); *see also Lucio v. Crites*, 2010 WL 1727122, at *5 (S.D. Tex. Apr. 28, 2010) ("[A]ssigning plaintiff to administrative segregation did not deter him from filing this lawsuit, nor does he suggest that he stopped filing grievances."). Here, even after the supposed interrogation of September 9, 2022, Plaintiff continued to file a litany of grievances over matters like the nature of his healthcare and the destruction of his altar (*see* Dkt. No. 1 at 1-3; *see also* Dkt. No. 69-9), several amended pleadings (*see* Dkt. Nos. 7, 13, 42, 50), and a litany of other court filings related to furthering the constitutional claims at issue, including discovery

requests (*see, e.g.*, Dkt. Nos. 13-2, 13-3). Based on the grievance of February 23, 2023, it also appears that Plaintiff's religious activities continued unabated. (*See* Dkt. No. 69-9).

For these reasons, the Magistrate Judge concludes as a matter of summary judgment that Plaintiff has failed to demonstrate a claim of First Amendment retaliation.

## V. CONCLUSION

As such, the Magistrate Judge RECOMMENDS that Defendants' *Motion for Summary Judgment* (Dkt. No. 69) be GRANTED and that their *Motion for Sanctions* (Dkt. No. 68) and *Motion to Dismiss* (Dkt. No 69) be DENIED as moot. Accordingly, the Magistrate Judge further RECOMMENDS that Plaintiff's claims be DENIED and that this civil action be DISMISSED.

### *Objections*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the court, except on grounds of clear error or manifest injustice.

### *Directive to Clerk of Court*

The Clerk of Court is DIRECTED to forward a copy of this report to the parties by any receipted means.

DONE at McAllen, Texas, this 10th day of March 2025.

_____
J. SCOTT HACKER
United States Magistrate Judge